Good morning, Your Honors. Richard Canatella, appearing for the appellant. Can I tell you something, and probably all attorneys, we have terrible acoustics in this room. So that microphone, you have to speak into it and speak loudly, and then we'll hear everything you say. Thank you, Your Honor. We're here today on the first appeal, which is a claim that a certain summary publication by the State Bar of California on my internet membership records website was false and misleading, allegedly, and had great prejudice and damage in the course of adversaries taking the summary and presenting it to probate courts, at least in the second amended complaint. And how this practice by adversaries was apparently to gain a collateral advantage in litigation on whatever issues were before the court that had really no relationship to the summary itself. Now, the first event was in July 2004, and that was the private appellee who published to John Dearman in the San Francisco Superior Court this summary seeking sanctions against me for allegedly making an improper motion to the probate court to enforce its decree of distribution in that case. This is Ms. Detweiler, is that correct? That's correct, Your Honor. And she is reporting something that is on the website, is that correct? Correct, Your Honor. And it was also published in the bar newspaper, the bar journal. In 2000. Yes, it was. So she's repeating things that she has learned from other places, not things that she knew of her own knowledge. Well, what she gave to the court, Your Honor, was the summary that had been published on the membership records website. Right, but she didn't have any firsthand knowledge of any of that information, did she? No. And she didn't provide anything to them that was in addition to what was published by the bar journal? No, she submitted the summary. Right. And that was in July 2004. And we were very careful about this. We didn't file until June 15, 2005. We waited because of some obvious problems that we were confronting. And we concluded after the second improper publication in the Sam Mateo Probate Court, we decided that something had to be done. So we filed. Let me ask you, the district court found that Detweiler was not a state actor. You brought a 1983 action that can only be against state actors. Do you have any difficulty with that ruling? Oh, yes, Your Honor. We conclude that in two respects there's state action. First, when you conspire, we allege, with a state agency, the state bar. In other words, the bar publishes something on my membership records which is available to the whole world. But the people that use it are adversaries who have a purpose in obtaining a collateral advantage in a particular litigation. And they are the ones that use it. So it's an invitation. But the question is, what facts did you allege to show a conspiracy between Detweiler and the bar? Well, you know, it's like the antitrust parallel action idea. That was our conspiracy theory. I didn't see facts that you alleged to show the conspiracy. If there are no facts alleged to show the conspiracy, I don't see how you've demonstrated state action. Well, when you have the bar publishing something and then another person picking it up, and we allege that it's an invitation on the bar's part, and we allege that Ms. Detweiler had a very antagonistic attitude and used that summary for that purpose, we concluded that that was enough to make a conspiracy. But even if we don't, we have aider and abetter, which we allege as well. And that doesn't even require a conspiracy. It's when it's an assisting in the accomplishment of a wrongful act. And we allege that. So either way, we felt we had a colorable claim for state action. I mean, that's a difficult point. Conceded. But now with the bar, we've got OIA. The district court didn't have that. Judge Zimmerman didn't have the benefit of OIA because OIA came down in 2006, and Judge Zimmerman granted summary judgment, I believe, in December of 2005. So while the case was pending appeal, OIA came down. And OIA, in our view, is on all fours with our case. We alleged in the district court very simply that Ms. Detweiler's publication of the summary to Judge Zimmerman was a repetition and independently actionable under common law in California. But when we had OIA, we didn't need the common law because, in my opinion, the way I read OIA, and it seems to be right on all fours with our case because we — Don't you depend on the Swofford case, the one out of Tennessee? Well, I did, but I don't have to now. Tell me how OJA helps you. Well, OJA helps us because what we had to establish under common law, defamation, was that the second publication, July 2004, is a repetition. And the repetition is a problem. Published on the same website. Different websites, Your Honor. In fact, that's what OIA addressed. Tell me what the website was on the first one, then. The CalBar.org. Okay. And the second website is Membership Records. Also, the California Bar website. Oh, so it is on CalBar.org. Well, no, I don't know if it is or not. I believe it is. Well, it's a different — It's just that you've got a different subset within the same website. Yes. And in OIA — Identical information found on the same website. So how does that make it a different publication? Well, this is OIA explains that. And it says simply, there's an analogy explaining why a publication on a second different website — A different website. This is the same website. Well, but when you analyze the website and the Internet, these are different pages. And the same fact pattern was in OIA. There was the same United States Army Corps of Engineers website, but the publications were found in different pages of that website. And this court held. That was sufficient to make the second pleading timely. And that's what we essentially rely on. And we think if you follow OIA, we should win. Would you like to reserve your time? Yes, Your Honor. Thank you, Your Honor. May it please the Court. I represent Randy Earlywine on behalf of the State Bar, the State Bar defendants. And I've had an agreement with counsel for Ms. Detweiler that I'll use eight minutes, if necessary, with two minutes for counsel for Ms. Detweiler. Your Honor, the issue as far as statute of limitations is the single publication rule, which Judge Zimmerman found applies to this case, and properly so. Under OJ, OJ reaffirmed California law that the single publication rule does apply to the Internet, much the same as any book or magazine is concerned. The counsel in his papers has raised an issue about this is the same website. This is the State Bar website. It was published. Mr. Canatella was disciplined in 1999, stipulated to the discipline. And as they have for over 50 years, the State Bar of California has summarized the discipline and publicized it initially in the form of the State Bar Journal in hard print. That changed in 1996 because of the emergence of the Internet. And in 1996, they began publishing the Bar Journal on the website itself. And there were advertisements or notices within each Bar Journal, I believe, some 16 or more times, indicating that the Bar Journal was going to be put online. Mr. Canatella was disciplined in 1999, stipulated to it. In 2000, it was no surprise to anybody. In fact, Mr. Canatella admitted before Judge Zimmerman that he read the hard print when it came out in the magazine. And that was the same summary that made its way when the hard print was just electronically put on the website, and that was in the year of 2000, February of 2000. The law in California is the single publication rule applies to that publication. Mr. Canatella was required to bring his lawsuit, if any, within one year from that date, which would have been February 2001. He did not bring his lawsuit in February 2000 until, I believe, July of 2005, and the court found that it was time-barred and properly so. Mr. Canatella wants to draw a distinction with the URL, that is, the actual website address. The State Bar along the way did at one point change over from the one URL to another, calbar.org, to calbarca.gov. But if you click on any of those, it's one website. That was the State Bar website. They just changed to technically URL. So as today, if you type in the original URL, which is calbar.org, you get to the same website as the new address. It's the same thing. What's the new address? It's calbar.ca.org? It's calbar.ca.gov. And if I may, just to follow up on that, even Mr. Canatella says, well, that's a different website, and under OJ that has some difference. And I disagree because under OJ they had two different websites. It was not clear what the second URL was, but the first one was a national site, and the second one was something different. This is, in fact, the same site, just a different URL. And if you type in both, you go to the State Bar website. Also, interestingly, that changeover was made in the year 2002, and there's a declaration of Nancy McCarthy at SER 448. And in the request for judicial notice, the evidence was that everything that was on that website, the initial website that got from a different URL went over to the new State Bar website in the year 2002. Everything got transferred over, including the February 2000 edition of the State Bar Journal that had Mr. Canatella's summary on it. So even if that was technically a different website under OJ, even assuming it applied, the statute of limitations began to run on that single publication rule from the year 2002. And Mr. Canatella, having filed in 2005, is still time barred under any analysis. Also, it is, I believe, interesting where you have one website, essentially, that goes into another website. It is the same target audience. There is no difference here. You saw in the Canerec case in the California Court of Appeal how you had differences based on the target audiences. This is the exact same website, the exact same audience as in the year 2000 when it was initially published. Thank you, counsel. We've got Mr. Maynes that we're going to hear from first. Good morning, Your Honors. My name is Steve Maynes, and I represent Martha Detweiler. As the Dennis Court pointed out, covered by the Jensen case, there's got to be joint action between Martha Detweiler and the State Bar defendants that would create the liability under 1983. There's got to be this close nixus joint action, as the Jensen Court pointed out. Here, there really is no allegation of that. None is possible. The courts have well recognized that when facts cannot be stated to support the basic claim, that the case can properly be dismissed, and I think that's true here. Mr. Canatella went through a second amended complaint. He failed to allege by that point any facts that would support an underlying conspiracy or an aiding, abetting, or direct state action liability on behalf of Ms. Detweiler. There's no allegation that she acted at the behest of the State Bar or was carrying out a State Bar function, or that she was in any way differently situated than any other public member. There was simply no linkage of actions between the State Bar and Martha Detweiler. All she did was access information on the website and bring that to the probate court's attention. The Jensen Court pointed out that in that situation, there was a physician, a private physician, who was under contract with the government to review the mental health of potential individuals who might be hospitalized. The court in Jensen recognized that the outcome would be totally different if a private party had hired Dr. Robinson, the defendant in that case, to admit the plaintiff to the hospital. So in that situation, Dr. Robinson relied on a false police report in making his decision to admit a person who was a private individual and who was being requested to be incarcerated on behalf of a private person. He would not have any liability. Our situation is no different here, Your Honors. The court would note, and has noted already, that Ms. Detweiler was simply relying upon publicly issued information by the State Bar. She had the right to rely on that being accurate. Any allegation there was conspiracy simply… May I entertain a question? Yes, Your Honor. When we had your adversary up there and we asked him about this, he indicated, but that's all right, aid and abetting will take care of the situation. Would you like to respond to that? Yes, I would, Your Honor. Aiding and abetting, of course, similar to conspiracy. Conspiracy, of course, requires an agreement or a meeting of the mind. There was none. Aiding and abetting liability has been analyzed by the Ninth Circuit in cases such as Harmsen, H-A-R-M-S-E-N, 693, Fed Second, 932, as early as 1982. This court, in that situation, pointed out, in a securities context, that you needed the existence of an independent wrong, in this case by the State Bar, actual knowledge by the alleged abater of that wrong, and the abater's, alleged abater's role in furthering that wrongful act by the State Bar. Here there's no knowledge on Ms. Dettweiler's part, no allegation that she knew that the State Bar had done anything wrong in publishing… Would that require us to first find a predicate wrong by the State? Yes, sir. So we would have to go ahead and get to the single publication rule to find that there was even a wrong before we could even get to the question as to whether Ms. Dettweiler had actual knowledge of that wrong. This is true, Your Honor. And then finally… What would it require, counsel? What would it require in terms of Ms. Dettweiler's knowledge about the single publication rule? Well, Your Honor, we'd have to know that not only that there had been a publication, which she obviously knew, but that that publication was wrongful, that that publication was defamatory, that violated some fundamental… You'd have to know that it's within the statute of limitations. Excuse me? Would she have to know that it was within the statute of limitations? I believe there would. There wouldn't be a wrong at that point. The statute of limitations is, I think, a substantive issue, such as the development of the plaintiff's claim, albeit a permanent defense. If it's already expired, I can't see how she could have liability. But finally, under the standard that I'm laying out, too, that she has to give substantial assistance in furthering the wrong, there's no indication here that, you know, if she didn't know it was wrongful, how the heck, how anyway could she know that she was subjecting herself to liability? You cited the Harmson case. Is that cited in your brief? No, it isn't, Your Honor. Afterwards, you can give the clerk a citation to it for our benefit. I would be happy to, Your Honor. I have other ones along the same vein as well. I apologize, Your Honor. Thank you, counsel. Thank you. All right. Mr. Panatella. Your Honor, let me address the bar's point first because, as the Court has pointed out, that's the first element before we even get into whether Daypiler has any liability at all. And the bar stipulated in the case below that the second publication was timely. In other words, we had a stipulation. It's in the briefs that in the event that the repetition in 2004 was actionable, then it would be within the statute. So I don't think it's proper for them to argue now that there's a 2002 cutoff date because that's not what we stipulated to in the district court. Secondly, they are two separate publications. That is, Internet addresses. But again... Do you want to give me those addresses, counsel? Yeah. The first address is the right here. It's after www. It's CalBar, CalGov, or CAGov, CalBar. That's CalBar.ca.gov. .ca.gov. Okay. CalBar2CBJ00FEBATTDISC.htm. Okay. Now the second one, and I'm remiss here. Here it is. I'll go from www. The second one is CalBar.ca.gov. That's the one you just gave us. That's one. Then it goes CalBar, search member, detail, ASPX, question mark, X equals 53264, which is my bar number. But, counsel, both of these are found at www.CalBar.ca.gov. That's the stem, yes. Now that's different from what I heard other counsel, which seemed to be a more favorable argument to you, which was that one of these addresses was www.CalBar.org. Well, yeah, that appears to be not accurate. And what counsel, as I understood what counsel said, was that the address was shifted to the .gov rather than the .org. But these are identical publications within a single website. I think what we have to look at here is we have to look at the audience. The audience in the original publication to the Internet, of course, were California lawyers. That's a whole different situation when the second publication is to the whole people that would. . . Let's take the magazine. What if the magazine, what if the CalBar Journal listed all, listed every month, listed disciplinary actions? And so in February we had a listing. And then at the end of the year they put everybody alphabetically. Two different publications? I don't think so. I think the two different . . . Two different magazines. You can come up and hold two different covers. Well, the way I read OJA, this was the U.S. Army Corps of Engineers website, too. Same thing. But different locations. Actually, in that case, OJA said it was on a different website. The URL was not provided in that case. The court in a footnote said they didn't have it. But OJA in his pleading had said it was a different website. But there's a problem with that. The website term is ambiguous. We tried to lay it out. It may be, but in that case that's what Mr. OJA said. Now, in your case, we actually have the URL addresses here. But I think if the court . . . You told me, in response to my question about the two magazines, that if we had two different magazines with two different magazine covers and one listed your listing in February and the other one in December listed a summary of the year and listed everybody alphabetically, that those would not be two different publications. I think I conceded too much because OJA says . . . All right. Now let me give you a different, let me change the hypothetical. Let's suppose that in the February issue that there are two separate listings, two paragraphs on you that are identical, one listing them by category of offense and another listing everybody alphabetically. But there are two different pages within the same magazine, two different publications? I think under OIA you've got two publications. Now, website is an ambiguous term. And we don't know what the second URL address was in OIA. We do know what it is here. We do know they are different. If you consider one page of a website, not a different website . . . Counselor, your bottom line then on this is that a website is . . . There are two different websites. Two websites are not identical if any term in the address is different. Well, I . . . You pretty much have to maintain because we have to go a long way down this address before we get to a different term, don't we? That's correct. And we don't have any authority for that. That's where if you came in for us here, you would be extending OIA without a doubt. But I think you would be comfortable with it because your audience in the second is membership records. The whole world, anybody that wants to see . . . well, that's what he did. And so now we can hold that against . . . You're finding it in two different places so that people can find it who are looking for different things. In different places, yes. Yes. And as far as . . . Your time has well expired. I think we understand your position, so thank you. All right. Canatella v. Vandekamp will be submitted, and we will take up the case of Canatella v. Stovitz. May I have one clarification on the stipulation that Mr. Canatella mentioned? Yes. Do you want to provide this in writing to us? It related to the link to the member search, but not to the posting of the bar journal that was posted in February of . . . and then in 2002 the bar journal was put on, and then in . . . the link to the member search function was put on. It's that stipulated to the second one, but not the first in terms of the . . . in the 2002, the bar journal being put on there. Thank you.
judges: Wallace, Bybee, Pregerson